IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ZYMERGEN INC., *et al.*,[1] | Case No. 23-11661 (KBO) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Curtis S. Miller (No. 4583)
Matthew O. Talmo (No. 6333)
Sophie Rogers Churchill (No. 6905)
Austin T. Park (No. 7274)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile:  (302) 658-3989

*Attorneys for the Debtors and*
*Debtors in Possession*

February 1, 2024

---

[1]   The Debtors in these chapter 11 cases, along with the Debtors' federal tax identification numbers, are Zymergen Inc. (2439), Lodo Therapeutics Corporation (8730), enEvolv, Inc. (2402), and Genesis Acquisition Sub, LLC (3640).  The mailing address for the Debtors is 1440 Stanford Ave., Emeryville, California 94608.

i.

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ....................................................................................................2

    I.    GENERAL BACKGROUND...................................................................2

    II.    PLAN AND DISCLOSURE STATEMENT ..........................................4

    III.    PLAN SOLICITATION AND VOTING RESULTS ............................5

ARGUMENT ..........................................................................................................6

    I.    THE COURT HAS JURISDICTION AND NOTICE WAS PROPER. ...............................................................................................6

        A.    Jurisdiction and Venue....................................................................6

        B.    Adequate Notice of Confirmation Hearing..................................6

    II.    THE PLAN SHOULD BE CONFIRMED. ...........................................7

        A.    The Plan meets all applicable requirements of the Bankruptcy Code. ...........................................................................7

            1.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).....................................7

                a.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ...............................................8

                b.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123 of the Bankruptcy Code. ...........................................10

                c.    The Plan Appropriately Contains Certain Discretionary Components Permitted By Section 1123(b) of the Bankruptcy Code...........................12

                d.    The Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should be Approved. ........................................15

TABLE OF CONTENTS (Continued)

Page

2.   The Plan Complies with Applicable Provisions of Section 1129(a)(2) of the Bankruptcy Code. ................................27

3.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)). .....................................................................27

4.   The Plan Provides for Court Approval of Payments for Services or Costs and Expenses (Section 1129(a)(4)). .....................................................................28

5.   The Plan and Plan Supplement Disclose the Liquidation Trustee and Liquidation Trust Board (Section 1129(a)(5)). ..........................................................29

6.   The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (Section 1129(a)(6)). .....................................................................30

7.   The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)). ...........................................30

8.   Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude Confirmation. ...................................................33

9.   The Plan Provides for Payment in Full of All Allowed Administrative and Priority Claims (Section 1129(a)(9)). ..........................................................34

10.   At Least One Impaired Class of Claims That Was Entitled to Vote Has Accepted the Plan (Section 1129(a)(10)). .................................................................34

11.   The Plan Is Feasible (Section 1129(a)(11)). ..................................35

12.   The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ...........................................36

13.   Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Not Applicable to the Plan. ....................................................36

14.   The Plan Meets the Requirements for Cramdown (Section 1129(b)). ..........................................................37

iii.

TABLE OF CONTENTS (Continued)

Page

a.     The Plan Does Not Discriminate Unfairly With Respect to Impaired Rejecting Classes. ....................37

b.     The Plan Is Fair and Equitable With Respect to the Rejecting Classes. ....................................38

15.    Section 1129(c) of the Bankruptcy Code Is Satisfied. .......................................................................40

16.    The Principal Purpose of the Plan Is Not Tax Avoidance (Section 1129(d)). ......................................40

CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) .................................................................................30, 39

*Grogan v. Garner*,
    498 U.S. 279 (1991) .................................................................................7

*In re Abeinsa Holding, Inc.*,
    562 B.R. 265 (Bankr. D. Del. 2016) ..........................................................38

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......................................................31

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000) ......................................................31

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (Bankr. D. Del. 2006) ......................................................7, 37

*In re Buttonwood Partners, Ltd.*,
    111 B.R 57 (Bankr. S.D.N.Y. 1990) ........................................................37

*In re Caribbean Petroleum Corp.*,
    512 B.R. 774 (Bankr. D. Del. 2014) ..........................................................18

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .......................................................39

*In re Coastal Broad. Sys., Inc.*,
    570 F. App'x 188 (3d Cir. 2014) ..............................................................8

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ..........................................................17

*In re Drexel Burnham Lambert Grp.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................28, 31, 38

*In re Emerge Energy Servs. LP*,
    2019 WL 7634308 (Bankr. D. Del. 2019) ...................................................23

*In re Exaeris, Inc.*,
    380 B.R. 741 (Bankr. D. Del. 2008) ..........................................................17

iv

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .......................................................................18

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................9

*In re Indianapolis Downs, LLC*
    486 B.R. 286 (Bankr. D. Del.) .......................................................................24, 35

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).......................................................................8, 38

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) .......................................................................38

*In re Kaplan*,
    104 F.3d 589 (3d Cir. 1997).......................................................................35

*In re Lernout & Hauspie Speech Prod., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) .............................37

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).......................................................................18

*In re Nuverra Env't Solutions, Inc.*
    590 B.R. 75 (D. Del. 2018).......................................................................38

*In re Orlando Invs. LP*,
    103 B.R. 593 (Bankr. E.D. Pa. 1989) .......................................................................35

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D.Del. 1998) .......................................................................27

*In re Printing Dimensions, Inc.*,
    153 B.R. 715 (Bankr. D. Md. 1993) .......................................................................28

*In re S & W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) .......................................................................8

*In re Sound Radio, Inc.*,
    93 B.R. 849 (Bankr. D.N.J. 1988) .......................................................................27

*In re Trans World Airlines, Inc.*,
    261 B.R. 103 (Bankr. D. Del. 2001) .......................................................................13

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) .......................................................................7, 35

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) .......................................................................8

*In re W.T. Grant Co.*,
699 F.2d 599 (2d Cir. 1983) ................................................................................17

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................17, 18, 23

*In re Wash Mut., Inc.*,
461 B.R. 200 (Bankr. D. Del. 2011) ....................................................................35

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................17

*In re WorldCom, Inc.*,
Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
2003) .................................................................................................................37

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ............................................................. *passim*

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993) ............................................................................8, 9

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ..........................................................................35, 37

*Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*,
354 B.R. 1 (D. Conn. 2006) ................................................................................38

*NLRB v. Bildisco & Bildisco*,
682 F.2d 72 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ......................................13

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
872 F.2d 36 (3d Cir. 1989) ................................................................................13

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*,
426 B.R. 114 (Bankr. D. Del. 2010) ........................................................17, 18, 22

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990) ..........................................................................................35

*Wang v. Zymergen Inc.*,
Case No. 21-cv-06028-PCP (SVK) (N.D. Cal. Dec. 14, 2023) ............................21

**Rules and Statutes**

11 U.S.C. § 365 ..............................................................................................12, 13, 15

11 U.S.C. § 507 ........................................................................................................10

11 U.S.C. § 1102 .......................................................................................................3

11 U.S.C. § 1107 .......................................................................................................2

11 U.S.C. § 1108 .......................................................................................................2

11 U.S.C. § 1114 ......................................................................................................36

11 U.S.C. § 1122 .................................................................................................8, 9, 10

11 U.S.C. § 1123 ................................................................................................ *passim*

11 U.S.C. § 1125 ......................................................................................................27

11 U.S.C. § 1126 ................................................................................................ *passim*

11 U.S.C. § 1129 ................................................................................................ *passim*

28 U.S.C. § 157 .........................................................................................................6

28 U.S.C. § 1334 .......................................................................................................6

28 U.S.C. § 1408 .......................................................................................................6

28 U.S.C. § 1409 .......................................................................................................6

28 U.S.C. § 1930 ......................................................................................................36

Fed. R. Bankr. P. 2002 ...............................................................................................6

Fed. R. Bankr. P. 6006 ...............................................................................................6

Fed. R. Bankr. P. 9007 ...............................................................................................6

Fed. R. Bankr. P. 9014 ...............................................................................................6

Fed. R. Bankr. P. 9019 .............................................................................................17

Securities Act of 1933 § 5 .........................................................................................40

**Other Authorities**

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........................................8

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787.................................................8

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this (a) memorandum of law in support of confirmation of the *First Amended Chapter 11 Plan of Liquidation* [D.I. 281-1] (as may be amended, modified and/or supplemented, the "Plan").[2] In further support of the Plan, the Debtors have filed concurrently herewith (a) the declaration of Ivona Smith of Drivetrain, LLC [D.I. 353] (the "Smith Declaration") and (b) a proposed form of order confirming the Plan (as may be amended, modified and/or supplemented, the "Confirmation Order"). The Debtors also rely upon the balloting tabulation prepared by Epiq Corporate Restructuring, LLC, the Debtors' balloting agent, which was filed with the Court on January 31, 2024 [D.I. 343] (the "Voting Declaration"), and the applicable affidavit of service filed by Epiq in connection with Plan solicitation [D.I. 298].

## PRELIMINARY STATEMENT

1.      The Debtors commenced these chapter 11 cases less than four months ago with the goal of maximizing recoveries to creditors. As the Debtors have stated from the beginning of these cases, the path to achieving this goal relied on two primary objectives: minimizing administrative expenses by exiting bankruptcy swiftly and maximizing the sale price of their assets. Due to the coordinated efforts of the Debtors, the Committee, Ginkgo Bioworks, Inc. ("Ginkgo"), and other key stakeholders, these chapter 11 cases have achieved this goal. Within two months of the commencement of these cases, the Debtors had negotiated a global settlement between the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and Ginkgo, to reach a higher and better Stalking Horse Bid, amend the Plan to be more favorable to unsecured creditors, and resolve potential costly litigation.

---

[2]      Capitalized terms used but not defined herein are defined in the Plan.

2.      The Debtors also executed a thorough marketing process and auction which culminated in the consummation of sales to Ginkgo and Pivot Bio, Inc. for substantially all of the Debtors assets.  Through these combined sales, the Debtors successfully maximized the value of their assets to achieve a purchase price higher and better than the Stalking Horse Bid.  Moreover, the Debtors negotiated with several other constituencies, including the Securities and Exchange Commission, the plaintiffs and IPO underwriters in the pending securities litigation against the Debtors, and the U.S. Trustee, to resolve their comments to the Plan and Confirmation Order. Combined, the parties' efforts will result in substantial recoveries to creditors and an efficient Plan confirmation process, all within approximately four months of the commencement of these cases.

3.      The Plan is the best available option for maximizing recoveries to the Debtors' creditors.  If confirmed, the Plan will (a) provide funding to pay all amounts required under the Plan, including payment in full of all administrative expense and priority claims, and (b) fund the Wind-Down Budget which will provide for the distributions required to be made under the Plan and to pay expenses and costs of administering the Wind-Down Estates.

4.      As set forth in further detail below, the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and all other applicable law, and should therefore be confirmed.  Accordingly, the Debtors will seek entry of the Confirmation Order at the hearing on February 5, 2024 and move to consummate the Plan immediately.

## **BACKGROUND**

### I.      **GENERAL BACKGROUND**

5.      On October 3, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

6.      The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in the *Declaration of Claire Smith in Support of Chapter 11 Petitions and First Day Relief* [D.I. 9], which is incorporated herein by reference.

7.      On October 13, 2023, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

8.      Shortly after the formation of the Committee, the Debtors engaged in robust arms'-length negotiations with the Committee and Ginkgo to reach a global resolution of the Committee's objections to the Stalking Horse Agreement, Bidding Procedures, and Plan.  To that end, the parties achieved a resolution that increased the value of the Stalking Horse Bid, revised certain provisions of the Plan to be more favorable to creditors, including provisions related to the releases contained therein, and avoided value-destructive litigation.  On November 14, 2023, the Debtors filed a Global Settlement Term Sheet [D.I. 173], which the Court approved on December 8, 2023 [D.I. 251].

9.      Moreover, the Debtors have conducted a robust sale process throughout these chapter 11 cases.  On November 20, 2023, the Court entered an order [D.I. 194] establishing bidding procedures for the sale of the Debtors' assets and approving the Debtors' entry into the Stalking Horse Agreement.  Beginning on December 13, 2023, in accordance with the Bidding Procedures Order, the Debtors held a two-day auction which resulted in achieving a higher and better sale price through two separate bids from Ginkgo and Pivot Bio.  On December 18, 2024, the Debtors closed the sales to Ginkgo and Pivot Bio, bringing $8,600,000 in cash into the estates and relieving the estates of over $10,000,000 in liabilities.

## II.       PLAN AND DISCLOSURE STATEMENT

10.      The Debtors filed their initial Plan [D.I. 27] and Disclosure Statement [D.I. 28] on the Petition Date.  On December 18, 2023, the Debtors filed a revised Disclosure Statement [D.I. 267]. On November 29, 2023, the Court entered an order [D.I. 208] (the "Solicitation Procedures Order") (a) approving the Disclosure Statement, (b) scheduling a hearing to confirm the Plan, and (c) establishing procedures for the solicitation of the Plan and tabulation of votes to accept or reject the Plan.  The Debtors commenced solicitation of the Plan on December 26, 2023.

11.      On January 17, 2024, the Debtors filed their plan supplement [D.I. 319] (including all exhibits thereto and as amended, modified and/or supplemented from time to time, the "Plan Supplement"), which provides information regarding a variety of topics relating to the Plan and the transactions contemplated thereby, including (i) the Liquidation Trust Agreement, (i) the Assumption Schedule, and (iii) the identities of the Liquidation Trustee and the Delaware Trustee.

12.      The overall purpose of the Plan is to provide for the liquidation of the Debtors in a manner designed to maximize recovery to stakeholders by, among other things, paying all Claims necessary to confirm the Plan, establishing a Liquidation Trust, and providing for the orderly wind down of the Debtors.

13.      Specifically, the Plan provides:[3]

> a.   payment in full of all Allowed Administrative Expense Claims, Fee Claims, U.S. Trustee Fees, Secured Claims, Priority Tax Claims, and Priority Non-Tax Claims;

---

[3]     The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan and in the event of any inconsistency, the Plan shall control in all respects.

b. holders of General Unsecured Claims shall receive a Pro Rata Share of Cash from the Liquidation Trust after payment of (or the establishment of a sufficient Reserve for) all Liquidation Trust Expenses and all senior Claims;

c. funding of a Liquidation Trust pursuant to the Wind-Down Budget to govern the liquidation of the Debtors' estates and remaining assets following the Effective Date; and

d. distributions under the Plan shall be funded from Cash on hand, including the proceeds of the Sales Transactions that are received before, on, or after the Effective Date.

### III.    PLAN SOLICITATION AND VOTING RESULTS

14.    On December 26, 2023, the Debtors began soliciting votes on the Plan by distributing the Disclosure Statement and related materials to holders of Class 3 Claims that were entitled to vote under the Plan, as required by the Solicitation Procedures Order.  Specifically, the Debtors transmitted: (a) the *Notice of (I) Approval of Disclosure Statement, (II) Deadline for Casting Votes to Accept or Reject the Plan, and (III) the Hearing to Consider Confirmation of the Plan*  [D.I. 284] (the "Confirmation Hearing Notice"); (b) the Disclosure Statement and Plan; (c) a copy of the Solicitation Procedures Order; and (d) the Ballot to all known holders of Class 3 Claims, which was the only Class entitled to vote to accept or reject the Plan.

15.    In addition, the Debtors caused to be served the (i) Confirmation Hearing Notice on the parties listed in the creditor matrix and all other parties entitled to receive such notice pursuant to the Solicitation Procedures Order, (ii) Non-Voting Notice on Holders of Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Secured Claims), Class 5 (Interests), Class 6A (Intercompany Claims), and Class 6B (Intercompany Interests), and (iii) Non-Voting Notice and Opt-In Election Form on holders of Claims in Class 4 (Subordinated Claims).

16.    The voting deadline and Plan objection deadline were scheduled for January 24, 2024.  The Confirmation Hearing was originally scheduled for February 2, 2024, but was

rescheduled at the request of the Court to February 5, 2024, at 10:00 a.m. (ET). *See Notice of Rescheduled Confirmation Hearing* [D.I. 303].

17. As set forth in the Voting Declaration, the Debtors received 100 percent acceptance of the Plan from the voting class for all Debtors. Under the Plan, Class 1 (Other Priority Claims) and Class 2 (Secured Claims) are unimpaired and deemed to have accepted the Plan, and thus were not entitled to vote to accept or reject the Plan.[4] Class 4 (Subordinated Claims), Class 5 (Interests), Class 6A (Intercompany Claims), and Class 6B (Intercompany Interests) will not receive any distribution under the Plan, are deemed to have rejected the Plan, and were not entitled to vote to accept or reject the Plan.[5]

## ARGUMENT

### I.   THE COURT HAS JURISDICTION AND NOTICE WAS PROPER.

#### A.   Jurisdiction and Venue

18. This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

#### B.   Adequate Notice of Confirmation Hearing

19. In accordance with Bankruptcy Rules 2002, 6006, 9007, and 9014, the Solicitation Procedures Order, the Confirmation Hearing Notice, and the solicitation procedures

---

[4]   *See* 11 U.S.C. § 1126(f).

[5]   *See id.* § 1126(g).

set forth therein, adequate notice of (i) the time for filing objections to confirmation of the Plan,

(ii) the transactions, settlements and compromises contemplated thereby, and (iii) the Confirmation

Hearing was provided to all holders of Claims and Interests and other parties in interest entitled to

receive such notice under the Bankruptcy Code and the Bankruptcy Rules.  No other or further

notice of the Confirmation Hearing is necessary or required.

## II.      THE PLAN SHOULD BE CONFIRMED.

### A.      The Plan meets all applicable requirements of the Bankruptcy Code.

20.      To confirm the Plan, the Court must find that the provisions of section 1129

of the Bankruptcy Code have been satisfied by a preponderance of the evidence.[6]  The Debtors

submit that based on the record of these chapter 11 cases, the Smith Declaration, the Voting

Declaration, and the Debtors' arguments set forth herein, the applicable burden is clearly satisfied

and the Plan complies with all relevant sections of the Bankruptcy Code, Bankruptcy Rules, and

applicable non-bankruptcy law.  In particular, the Plan fully complies with the requirements of

sections 1122, 1123, and 1129 of the Bankruptcy Code. Each requirement is addressed below.

#### 1.      *The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).*

21.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with

the applicable provisions of the Bankruptcy Code.  The principal objective of section 1129(a)(1)

is to assure compliance with the sections of the Bankruptcy Code governing classification of

---

[6]      *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Tribune Co.*, 464 B.R. 126, 151–52 (Bankr. D. Del. 2011) ("Tribune I"), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011). Preponderance of the evidence has been described as just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants. . . .") (citations omitted).

7

claims and interests and the contents of a plan.[7]  Consequently, the determination of whether the

Plan complies with section 1129(a)(1) requires an analysis of sections 1122 and 1123 of the

Bankruptcy Code.  As explained below, the Plan complies with sections 1122 and 1123 in all

respects.

> a.   The Plan Satisfies the Classification
>      Requirements of Section 1122 of the
>      Bankruptcy Code.

22.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a

claim or an interest in a particular class only if such claim or interest is substantially similar to the

other claims or interests of such class."  11 U.S.C. § 1122(a).

23.    The Third Circuit "permits the grouping of similar claims in different

classes" as long as those classifications are reasonable.[8]  The classifications, however, cannot be

"arbitrarily designed" to secure the approval of an impaired class when "the overwhelming

sentiment of the impaired creditors [is] that the proposed reorganization of the debtor would not

serve any legitimate purpose."[9]  Accordingly, the Third Circuit has held that the only requirement

for classification is that it be "reasonable."[10]  Separate classes of similar claims are reasonable

---

[7]   The legislative history of section 1129(a)(1) explains that this provision is intended to draw in the requirements
      of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of
      a plan, respectively. S. Rep. No. 95-989, at 126 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R.
      Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re S & W Enter.*, 37 B.R. 153,
      158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that
      although its scope is certainly broad, the provisions it was more directly aimed at were Sections 1122 and 1123.").

[8]   *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see also In re Tribune Co.*, 476 B.R. 843, 854–
      55 (Bankr. D. Del. 2012).

[9]   *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993).

[10]  *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary
      to that rule is that the 'grouping of similar claims in different classes' is *permitted* so long as the classification is
      'reasonable.'") (internal citation omitted).

when each class represents "a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed."[11] Courts have recognized that this gives both the debtor and the bankruptcy court considerable discretion in determining whether similar claims may be separately classified.[12] Furthermore, if it is evident based on the voting results that the debtor would have an impaired accepting class regardless of the chosen classification scheme, then any challenge to the classification scheme is moot because the plan would have been accepted even if the classes were constituted differently.

24.     Section 1122 of the Bankruptcy Code also expressly permits a Plan to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."[13]

25.     Here, the Plan's classification of Claims and Interests satisfies section 1122(a) of the Bankruptcy Code. The Plan designates a total of seven Classes of Claims and Interests of the Debtors.  This classification satisfies section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other. Furthermore, the classification scheme used by the Plan is based on the similar nature of Claims or Interests contained in each Class and not on any impermissible classification factor.[14] Finally, no party has objected to the Debtors' classification scheme and the Debtors submit that similar

---

[11]   *John Hancock Mut. Life Ins. Co.*, 987 F.2d. at 159.

[12]   *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000).

[13]   11 U.S.C. § 1122(b).

[14]   *See* Smith Decl. ¶ 14.

Claims and Interests have not been placed into different Classes in order to affect the outcome of the vote on the Plan.  Therefore, the Court should approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

> b.       The Plan Satisfies the Mandatory Plan Requirements of Section 1123 of the Bankruptcy Code.

26.       The Plan satisfies the seven mandatory requirements of sections 1123(a)(1) through (7).

27.       Sections 1123(a)(1)-(4). Specifically, Sections 3 and 4 of the Plan satisfy the first four requirements of section 1123(a) by: (a) designating seven Classes of Claims and Interests, not including Claims of the kinds specified in sections 507(a)(2), (a)(3) and (a)(8) of the Bankruptcy Code, as required by section 1123(a)(1); (b) specifying the Classes of Claims and Interests that are unimpaired under the Plan, as required by section 1123(a)(2); (c) specifying the treatment of each Class of Claims and Interests that is impaired, as required by section 1123(a)(3); and (d) providing for the same treatment for each Claim or Interest within a particular Class, unless otherwise agreed by the holder of a particular Claim, as required under section 1123(a)(4).

28.       Section 1123(a)(5). Furthermore, Section 6 of the Plan sets forth the means for implementation of the Plan in accordance with section 1123(a)(5), which the Debtors submit are adequate. Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means" for implementation.[15]  The implementation mechanisms in the Plan include, among other things:

---

[15]    11 U.S.C. § 1123(a)(5).

- distributions under the Plan to be funded from Cash on hand including the proceeds of the Sale Transactions;

- the establishment of a Liquidation Trust pursuant to the Wind-Down Budget to govern the liquidation of the Debtors' estates and remaining assets following the Effective Date; and

- appointment of the Liquidation Trustee to coordinate the liquidation and dissolution of the Debtors and distribution of recoveries to creditors.

29.      Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

30.      Section 1123(a)(6). Section 1123(a)(6) of the Bankruptcy Code requires that the charter of the debtor, or the surviving corporation if the debtor is transferring all of its property or merging or consolidating with another entity, contain a provision prohibiting the issuance of nonvoting equity securities.[16] Section 1123(a)(6) is not applicable under the Plan because no new equity securities are being issued. The Debtors' corporate entities will be wound down (and ultimately dissolved) and will not be issuing securities. Thus, the requirement that the Debtors' new organizational documents prohibit the issuance of nonvoting equity securities does not apply in these Chapter 11 Cases.

31.      Section 1123(a)(7). Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any director, officer or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[17] Pursuant to Section 6.6 of the Plan, on the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated

---

[16]   *Id.* § 1123(a)(6).

[17]   *Id.* § 1123(a)(7).

automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Liquidation Trustee, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date. Moreover, pursuant to Section 6.3(d) of the Plan and the Liquidation Trust Agreement, on the Effective Date, the Liquidation Trustee and Delaware Trustee shall be appointed. The Debtors disclosed the identities of the Liquidation Trustee and Delaware Trustee as part of the Plan Supplement, which is consistent with the interest of creditors and with public policy. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

      c.      The Plan Appropriately Contains Certain Discretionary Components Permitted By Section 1123(b) of the Bankruptcy Code.

32.     Section 1123(b) of the Bankruptcy Code sets forth permissive components that may be incorporated into a chapter 11 plan. Specifically:

a.    in accordance with section 1123(b)(1) of the Bankruptcy Code, Section 3 of the Plan provides that each particular Class is impaired or left unimpaired, as the case may be;

b.    in accordance with section 1123(b)(2) of the Bankruptcy Code, Section 9 of the Plan provides for the assumption, assumption and assignment or rejection of the Debtors' executory contracts and unexpired leases that have not been previously assumed, assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and prior orders of the Court;

c.    in accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the Plan incorporates the settlement and adjustment of claims or interests belonging to the Debtors and their estates;

d.    in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Section 6.12 of the Plan provides that, among other things, except with respect to the Released Parties or any other beneficiary of the releases, injunctions, and exculpations contained in Section 11 of the Plan, the Liquidation Trustee shall have, retain, reserve and be entitled to assert all Causes of Action that the Debtors had immediately prior to the Effective Date;

12

e.  in accordance with section 1123(b)(5) of the Bankruptcy Code, Section 4 of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class; and

f.  in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code.

33.     Under section 1123(b)(2) of the Bankruptcy Code, "a plan may, subject to section 365, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected."[18] Section 365(a) of the Bankruptcy Code provides that a debtor, subject to the court's approval, may assume or reject any executory contract or unexpired lease. Bankruptcy courts generally approve a debtor's decision to assume, assume and assign, or reject executory contracts or unexpired leases where such decision is made in the exercise of such debtor's sound business judgment and benefits its estate.[19] The business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim or caprice.[20]

34.     Section 9.1 of the Plan provides that each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with a Sale Transaction) shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is the

---

[18]  *Id.* § 1123(b)(2).

[19]  *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984).

[20]  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).

Settlement Agreement or a contract, lease, or other agreement or document entered into in connection with the Plan; (iii) is a D&O Policy or an insurance policy; or (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement. The Assumption Schedule was filed and served as part of the Plan Supplement [D.I. 319].

35.     The Debtors believe that such relief is appropriate as the Debtors are in the process of winding down their estates and will have no need for the vast majority of their remaining contracts and leases after the Effective Date, which will continue to be an unnecessary expense of the Wind-Down Estates, if not rejected.[21] The Plan provides that parties with Claims arising from the rejection of executory contracts or unexpired leases pursuant to the Plan will have thirty (30) days after the notice of occurrence of the Effective Date, to file a proof of claim relating to rejection damages. The Debtors believe that confirmation of the Plan is a sufficient forum to address the rejection of the Debtors' executory contracts and unexpired leases, and that the notice of the Effective Date will provide sufficient notice to all counterparties of the deadline to file claims against the Debtors for rejection damages.

36.     The Debtors also submit that they have satisfied the applicable requirements with respect to the handful of executory contracts that they will assume on the Effective Date (the "Assumed Contracts"). Here, all counterparties to the Assumed Contracts were provided with a notice listing their agreement in the Assumption Schedule in the Plan Supplement. Only one contract counterparty objected to the proposed assumption and cure amount of their contract, which the Debtors expect to resolve before the Confirmation Hearing. The Debtors are authorized to assume such agreements provided that, to the extent necessary, the Debtors have: (a) cured, or

---

[21]   *See* Smith Decl. ¶ 16(b).

provided adequate assurance that they will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code; (b) compensated or provided adequate assurance that they will promptly compensate the counterparties for any actual pecuniary loss resulting from such default; and (c) provided adequate assurance of future performance under the agreements.[22] With respect to cure costs, the proposed cure amounts set forth for each Assumed Contract are based on the Debtors' review of their books and records. Regarding adequate assurance of future performance, the Debtors and/or the Wind-Down Estates have sufficient liquidity from, among other sources, the Wind-Down Budget provided under the Plan, to address the obligations under the agreements in the ordinary course of business.[23]

37.     Accordingly, assumption and rejection of the Executory Contracts and Unexpired Leases under the Plan and Confirmation Order, as applicable, should be approved as a sound exercise of the Debtors' business judgment.

d.    <u>The Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should be Approved.</u>

38.     Section 11 of the Plan provides for: (a) releases by the Debtors of the Released Parties;[24] (b) releases of any Released Parties by and among the other Released Parties;

---

[22]    *See* 11 U.S.C. § 365(b).

[23]    *See* Smith Decl. ¶ 35.

[24]    "**<u>Released Parties</u>**," as defined in Section 1.77 of the Plan, means collectively, and in each case, solely in their respective *capacities* as such: (i) the Debtors; (ii) the current directors, officers, and members of management of the Debtors for conduct occurring on and/or after October 19, 2022; (iii) the Wind-Down Estates; (iv) Ginkgo; and (v) with respect to any Person or Entity in the foregoing clauses (i) through (iv), the predecessors, successors and assigns, subsidiaries, members, partners, officers, directors, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, consultants, and other professionals (collectively, the "<u>Related Parties</u>").

(c) releases of any Released Parties by the Releasing Parties;[25] (d) an injunction precluding holders of Claims against or Interests in any of the Debtors or their Estates from bringing any action against the Debtors or their Estates or otherwise taking any action inconsistent with the Plan; and (e) exculpation for certain parties related to Court-approved transactions in these chapter 11 cases. As set forth in full detail in the Plan, these provisions comply with the Bankruptcy Code and applicable non-bankruptcy law and are necessary integral components of the Plan. The releases in the Plan are in exchange for, and are supported by, fair, sufficient, and adequate consideration provided by the parties receiving such releases and are a good faith compromise of the Claims released. These provisions are proper because, among other things, they are reasonable, in the best interests of the Debtors and their Estates, the product of good faith, arm's-length negotiations, in exchange for substantial consideration from various parties, including the Released Parties, and critical to obtaining the support of various constituencies for the Plan.[26]

### (i)    Debtor Releases Are Permissible and Should Be Approved.

39.    Section 11.4 of the Plan provides for the release and waiver of all claims, any and all actions, causes of action, Avoidance Actions, controversies, liabilities, obligations,

---

[25]  "**Releasing Parties**" as defined in Section 1.78 of the Plan, means collectively, and in each case, solely in their respective *capacities* as such: (i) the Released Parties; (ii) all holders of General Unsecured Claims in Class 3 who vote to accept the Plan and do not opt out of the voluntary release contained in Section 11.5 of the Plan by checking the "opt out" box on the ballot and returning it in accordance with the instructions set forth thereon; (iii) all holders of Subordinated Claims in Class 4 who opt in to the voluntary release contained in Section 11.5 of the Plan by checking the "opt in" box on the opt-in election form and returning it in accordance with the instructions set forth thereon; and (iv) with respect to any Person or entity in the foregoing clauses (i) through (iii) the Related Party of such Person or Entity solely with respect to derivative claims that such Related Party could have properly asserted on behalf of a Person or Entity identified in clauses (i) through (iii); provided, however, that the Persons and Entities identified in part (iv) shall be Releasing Parties only to the extent the corresponding Persons and Entities in parts (i)-(iii) are legally entitled to bind such Persons and Entities in part (iv) to the releases contained in the Plan under applicable non-bankruptcy law.

[26]  *See* Smith Decl. ¶ 19.

rights, suits, damages, judgments, any right of setoff, counterclaim, or recoupment that could have been asserted by or on behalf of the Debtors or their Estates against any Released Party (the "Debtor Releases"). The Debtors have proposed the Debtor Releases based on their business judgment and submit that the Debtor Releases are reasonable and satisfy the standard that courts generally apply when reviewing these types of releases.

40.      Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[27] Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[28]

41.      In addition to analyzing debtor releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a "debtor release" in light of five "*Zenith* factors" in the context of a chapter 11 plan:

  a. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

  b. whether the release is critical to the debtor's reorganization;

  c. agreement by a substantial majority of creditors to support the release;

---

[27]  11 U.S.C. § 1123(b)(2); *see In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (settlement must be within reasonable range of litigation possibilities).

[28]  *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citation omitted).

d.   identity of interest between the debtor and the third party; and

e.   whether a plan provides for payment of all or substantially all of the classes of claims in the class or classes affected by the release.[29]

42.   No one factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[30]

43.   Here, the Debtors submit that the Debtor Releases are appropriate. First, each of the categories of the Released Parties has contributed significantly to the Debtors' chapter 11 efforts, including marketing and closing the Ginkgo Transaction and Pivot Bio Transaction (which are the primary drivers of creditor recoveries in these cases), negotiating and formulating the Plan and facilitating the progress made during these chapter 11 cases. Such efforts include the following, among others:

| Released Party | Consideration Provided |
|---|---|
| **Ginkgo** | • Engaging in extensive negotiations regarding the Ginkgo Sale Transaction, including, but not limited to, assuming or eliminating significant liabilities of the Debtors, to enhance creditor recoveries.<br><br>• Assisting the Debtors in negotiating with Pivot Bio and closing the Pivot Bio Transaction.<br><br>• Negotiating the Global Settlement Term Sheet [D.I. 173], agreeing to subordinate its claims to the Class 3 Claims, and formalizing the Settlement Agreement, ultimately approved by the Court [D.I. 251], which will produce a greater recovery for the holders of Allowed General Unsecured Claims in Class 3. |

---

[29]  *See In re Zenith Elecs. Corp*., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion, Inc.,* 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[30]  *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements); *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014) (finding "no question" that release of the Debtors' claims was proper because non-debtor "provided Debtors with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases.").

| Released Party | Consideration Provided |
|---|---|
| | • Supporting a consensual liquidation of the Debtors' Estates and funding the Wind-Down Budget.<br><br>• Devoting significant time and resources to negotiating the terms of the Plan and related documents and agreeing to vote for and otherwise support the Plan. |
| **The Committee** | • Expending time and effort to represent the interests of the general unsecured creditors.<br><br>• Propounding documentary discovery requests to the Debtors as part of evaluating the robustness of the sale process.<br><br>• Negotiating the Global Settlement Term Sheet [D.I. 173] and formalizing the Settlement Agreement, ultimately approved by the Court [D.I. 251], which will produce a greater recovery for the holders of Allowed General Unsecured Claims in Class 3.<br><br>• Actively supporting a consensual liquidation of the Debtors through the implementation of the Plan.<br><br>• Negotiating in good faith the terms of the Liquidation Trust Agreement on behalf of the Liquidation Trust Beneficiaries. |
| **Current Directors, Officers, Agents, Members of Management and Other Employees of the Debtors** | • Significant efforts on behalf of the Debtors prior to, and continuing throughout, these chapter 11 cases to effectuate the transactions set forth in the Plan, including, among other things, overseeing the marketing process (both prior to and during the bankruptcy proceeding).<br><br>• Significant efforts in connection with the Sale Transactions and Plan processes to maximize value for the Debtors' Estates. In particular, the Debtors' directors, officers and employees were critical to maintaining and preserving the value of the Ginkgo Assets and Pivot Bio Assets—the sales of which are contributing to the recovery to creditors in these cases. Such efforts included negotiating the business terms of the asset purchase agreements, reviewing and responding to hundreds of due diligence requests from numerous bidders, and overseeing the closings of both sales and ensuring a smooth transition process. |

| Released Party | Consideration Provided |
|---|---|
| | • Ensuring the uninterrupted operation of the Debtors' business during these chapter 11 cases and preserving the value of the Debtors' estates in a challenging operating environment.<br><br>• Responding to discovery requests from the Committee as it investigated and evaluated the sale process.<br><br>• Attending Court hearings and numerous board meetings, including meetings on short notice, overnight and on weekends, related to these chapter 11 cases and sale process. |
| Professionals of the Debtors and Committee | • Active participation, negotiation and documentations of the transactions during the prepetition and postpetition periods. |

44.     Second, the Debtor Releases are also critical to the Plan as a whole and represent valid and appropriate settlements of claims the Debtors may have against the Released Parties. The Plan was reached after extensive arm's-length negotiations among the Debtors, Ginkgo and the Committee. The releases constitute an integral aspect of these negotiations and without such protections, the Plan and the Sale Transactions may not have garnered the necessary support of the requisite parties, making it impossible for the Debtors to have moved through these chapter 11 cases.

45.     Third, the Debtor Releases are limited in scope. As is customary, the releases do not extend to claims arising out of or relating to any act or omission of a Released Party that constitute willful misconduct, actual fraud or gross negligence. Importantly, certain former officers and directors are not being released. Additionally, the Debtor Releases do not release direct claims held by third parties against any Released Party—such claims are preserved to the extent stakeholders object to or opt out of the Plan or refrain from opting in to the third party releases discussed below. Fourth, in consideration for the Debtor Releases, the Debtors and their Estates

20

will receive mutual releases from potential Claims and Causes of Action of each of the Released Parties.

46. The Debtor Releases are supported by all constituencies in these cases, including the Committee and Securities Litigation Class Representative.[31] Importantly, the Committee—the party with both an economic incentive and legal mandate to investigate potential claims—is supportive of the Debtor Releases. The Committee lodged several challenges to the proposed sale process, but ultimately concluded that negotiating and finalizing the Settlement Agreement, which included throwing its support behind the sale and plan process, was the most likely mechanism to maximize creditor recoveries. As stated by counsel to the Committee at the hearing on November 14, 2023:

> But this settlement reflects a simple calculus by the committee. We believe that the way to maximize value in this case for all creditors is a fast sale and a quickly confirmed plan, . . . get in, get out, minimize case costs, and get things distributed. And we believe that this settlement does that, it allows us to continue to progress the case even while things remain, to be frank, somewhat open. Importantly, [], the settlement preserves estate causes of action against the former directors and officers of Zymergen. . . . Those claims [have] all been preserved and they will be going into a liquidation trust, and they will be preserved for the benefit of creditors.
>
> So, in short, [] from our perspective, this settlement, while highly imperfect and not yet final, really allows us to progress the case, allows us to take the best shot at maximizing value and, most importantly, preserves, as much value as possible for creditors compared to wherever they were the day before the company filed, and that was exceedingly important to us.[32]

---

[31]  As used herein, "Securities Litigation Class Representative" shall mean Biao Wang, the court appointed lead plaintiff and class representative in the certified securities class action pending in the United States District Court for the Northern District of California under the caption, *Biao Wang, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. Zymergen Inc., et al., Defendants*, Case No. 21-cv-06028, (the "Securities Litigation") for himself and on behalf of the certified class in the Securities Litigation.

[32]  *In re Zymergen, Inc.*, No. 23-11661 (KBO) (Bankr. D. Del, Nov. 14, 2023), Hr'g Tr. 20:13-21:9.

47.     As part of the vigorous arm's-length negotiations over the Bid Procedures and Sale process with the Committee, the Debtors responded to extensive discovery requests from the Committee. The Debtors actively engaged with and responded meaningfully to all of the demands from the Committee. The Debtors do not believe they are releasing any material claims. Pursuing non-material claims against the Released Parties would not be in the best interests of the Debtors' various constituencies as the cost involved would likely outweigh any potential benefit of pursuing such claims. In light of these facts, it is a valid exercise of the Debtors' business judgment to conclude that the pursuit of any claims which no party to date has been able to identify would be unlikely to benefit their estates and parties in interest, as the costs of pursuing and prosecuting such claims would almost certainly outweigh any potential benefit to the Debtors, their estates and parties in interest.

48.     The Debtor Releases satisfy section 1123(b)(3)(A) of the Bankruptcy Code. For the foregoing reasons, the Debtors submit that the Debtor Releases are fair, reasonable and in the best interests of the Debtors' Estates. Therefore, the Debtor Releases should be approved as a valid exercise of the Debtors' business judgment.[33]

### (ii)     Third Party Releases Are Permissible and Should Be Approved.

49.     The Plan also provides for releases by certain non-Debtors. Section 11.5 of the Plan provides a limited consensual release in favor of the Released Parties only by and among

---

[33]     *See Spansion, Inc.*, 426 B.R. at 142 (approving as a valid exercise of business judgment the debtor's releases of, among others, the debtor's current directors, officers and employees, the debtor's current and former professionals, secured creditors and their advisors, the debtor and their affiliates, and their officers, directors, employees, and advisors and senior noteholders and their advisors).

the Releasing Parties, which are comprised of: (i) the Released Parties; (ii) all holders General Unsecured Claims in Class 3 who vote to accept the Plan and do not opt out of the voluntary release contained in Section 11.5 of the Plan by checking the "opt out" box on the ballot and returning it in accordance with the instructions set forth thereon; (iii) all holders of Subordinated Claims in Class 4 who opt in to the voluntary release contained in Section 11.5 of the Plan by checking the "opt in" box on the opt-in election form and returning it in accordance with the instructions set forth thereon; and (iv) with respect to any Person or entity in the foregoing clauses (i) through (iii), the Related Party of such Person or Entity solely with respect to derivative claims that such Related Party could have properly asserted on behalf of a Person or Entity identified in clauses (i) through (iii) (the "Third Party Releases" and, collectively with the Debtor Releases, the "Releases"). In addition to the notice via mail delivery, the Third Party Releases, Opt Out Election Forms, and Opt-In Election Forms were published on the Debtors' claims agent website.

50.    The Third Party Releases are consensual, appropriate and consistent with established precedent. Courts in this District allow releases of third-party claims against debtors where there is express consent of the party giving the release.[34] Here, the Third Party Releases do *not* apply to, nor will there be any attempt to impose them on, a nonconsensual basis. In addition, with respect to abstaining creditors and creditors who voted to reject the Plan, such parties did not grant a Third Party Release. With respect to certain creditors not entitled to vote—the holders of Subordinated Claims in Class 4—they received the ability to affirmatively consent to granting a Third Party Release by checking the "opt in" box on the opt-in election form and returning it in

---

[34]    *See In re Emerge Energy Servs. LP,* 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (consistent with the Court's holding requiring affirmative consent for a third party release to be consensual, here, holders in Class 3 received the ability to opt out and holders in Class 4 received the ability to opt in to third party releases); *see also Wash. Mut.,* 442 B.R. at 352 (requiring affirmative consent).

accordance with the instructions set forth thereon. Moreover, the Third Party Releases by holders of Claims and Interests are sufficiently narrow, do not provide a blanket immunity, and provide a specific carve-out for acts or omissions that constitute fraud, gross negligence or willful misconduct.[35] Importantly, former directors and officers of the Debtors who served prior to October 19, 2022, as well as J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, BofA Securities, Inc., UBS Securities LLC, and Lazard Freres & Co. LLC are not being released under either the Debtor Releases or Third Party Releases.

51.     The Third Party Release provisions are appropriate. Proper notice was provided to apprise holders of General Unsecured Claims in Class 3 of their obligation to opt out if they did not wish to grant the proposed releases. Proper notice was provided to apprise holders of Subordinated Claims in Class 4 of their ability to opt in to the voluntary release if they wished to grant the proposed releases. Courts in this District "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."[36] No creditor or party in interest has objected to the releases in the Plan. Here, the limited consensual Third Party Releases under the Plan are permissible and should be approved.

---

[35]  *See* Smith Decl. ¶ 18.

[36]  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (citing *Zenith*, 241 B.R. at 111); *see also* Revised Modified Second Am. Joint Chapter 11 Plan of Reorganization of smarTours, LLC and its Debtor Affiliate, *In re smarTours, LLC,* No. 20-12625 (KBO) [D.I. 192] at 11-12; Findings of Fact, Conclusions of Law, and Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, *In re Quorum Health Corp.*, No. 20-10766 (KBO) [D.I. 556] at 17; Findings of Fact, Conclusions of Law, and Order Confirming Third Am. Joint Chapter 11 Plan of Reorganization of Starry Group Holdings, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code, *In re Starry Grp. Holdings, Inc.*, No. 23-10219 (KBO) [D.I. 487] at 16; Findings of Fact, Conclusions of Law and Order Confirming Chapter 11 Plan for Tonopah Solar Energy, LLC, *In re Tonopah Solar Energy, LLC*, No. 20-11884 (KBO) [D.I. 291-1] at 15; *In re Gorham Paper and Tissue, LLC*, No. 20-12814 (KBO) [D.I. 438-1] at 35; Findings of Fact, Conclusions of Law, and Order Confirming the Second Am. Joint Plan of Liquidation of Stimwave Technologies Incorporated and Stimwave LLC Pursuant to Chapter 11 of the Bankruptcy Code, *In re Stimwave Techs. Inc.*, No. 22-10541 (TMH) [D.I. 791-1] at 11-12.

(iii)    **The Plan's Exculpation Provisions Are Permissible and Should Be Approved.**

52.    In addition to the Releases discussed above, the customary exculpation provisions found in Section 11.6 of the Plan should be approved. They are narrowly tailored and limited to parties who served in a fiduciary capacity in connection with the chapter 11 cases. The exculpation provisions exculpate the Exculpated Parties[37] from claims arising out of or related to, among other things, the administration of these chapter 11 cases, the postpetition marketing and sale process, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors, the creation of the Liquidation Trust; and the negotiation, formulation, and preparation of the Plan and Disclosure Statement.

53.    The exculpation provisions are appropriate under both the applicable law and the facts of these chapter 11 cases. Courts in the Third Circuit have approved exculpation provisions for estate fiduciaries for acts taken in connection with the Debtors' restructuring efforts, and do not extend to fraud, gross negligence and willful misconduct.[38] Furthermore, no party has objected to or opposed the Plan's exculpation provisions.

---

[37]    "**Exculpated Parties**" as defined in Section 1.42 of the Plan, means collectively, and in each case solely in their capacity as such: "(i) the Debtors; (ii) the current directors, officers and members of management of the Debtors; (iii) the Committee and each of its members; and (iv) to the extent they are or are acting as or for Estate fiduciaries at any time between the Petition Date and the Effective Date, the successors and assigns, subsidiaries, members, employees, partners, officers, directors, agents, attorneys, advisors, accountants, financial advisors, investment bankers, consultants, and other professionals of or for any of the Persons identified in (i) through (iii) above on or after the Petition Date solely in their capacity as such."

Note, as part of addressing information comments received from the U.S. Trustee, the Debtors narrowed the definition of Exculpated Parties.

[38]    *See*, *e.g.*, *In re Western Glob. Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Nov. 21, 2023) [D.I. 473] at 5 (confirming a bankruptcy plan that included debtors, the debtors' current managers, the unsecured creditors' committee, and their professionals as exculpated parties).

54.     Here, the scope of the exculpation provision is appropriately limited to the Debtors, the Committee and the other estate fidcuiaries that participated in the Debtors' chapter 11 cases and in the negotiation and implementation of the Plan, and has no effect on liability that results from fraud, gross negligence or willful misconduct. Therefore, the Debtors respectfully request that the Court approve the exculpation set forth in Section 11.6 of the Plan.

**(iv)     The Plan's Injunction Provisions Are Permissible and Should Be Approved.**

55.     The injunction contained in Section 11.7 of the Plan (the "Plan Injunction") is necessary to effectuate the Releases and the exculpation provisions of the Plan and to protect the Debtors from any potential litigation after the Effective Date from prepetition stakeholders whose claims and interests are addressed in the Plan. Without the Plan Injunction, there would be no mechanism to enforce the provisions of the Plan, the Liquidation Trust and the Wind-Down Estates—which are liquidating and have limited wind down funding—could be faced with numerous lawsuits in various jurisdictions related to Claims and Interests that are treated under the Plan.

56.     The Plan Injunction is a key component of the liquidation of the Estates and is similar to those previously approved in this District.[39] Accordingly, the Debtors submit that the Plan Injunction should be approved.

---

[39]    *See, e.g., id.*; *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) [D.I. 816] at 8; *In re Pace Indus., LLC*, No. 20-10927 (MFW) (Bankr. D. Del. Apr. 12, 2020) [D.I. 215] at 21-22.

### 2. The Plan Complies with Applicable Provisions of Section 1129(a)(2) of the Bankruptcy Code.

57.   The Debtors have complied with the applicable provisions of the Bankruptcy Code in accordance with section 1129(a)(2) of the Bankruptcy Code. A principal purpose of section 1129(a)(2) is to ensure that plan proponents have complied with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[40] As discussed above, the Debtors have complied with all notice, solicitation and disclosure requirements set forth in the Bankruptcy Code and the Bankruptcy Rules in connection with the Disclosure Statement and Plan.

### 3. The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

58.   Section 1129(a)(3) of the Bankruptcy Code requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law."[41] In the Third Circuit, "good faith" requires that a "plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and the purposes of the Bankruptcy Code.'"[42]

---

[40]   S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[41]   11 U.S.C. § 1129(a)(3).

[42]   *Zenith*, 241 B.R. at 107 (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("[C]ourts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'") (internal citation omitted).

59.     Here, the Plan is designed to maximize stakeholder recoveries and complies with the objectives and the mechanisms of the Bankruptcy Code.[43] The Plan is the product of arm's-length negotiations among the Debtors and their key creditor constituencies, including Ginkgo, the Committee, the Securities Litigation Class Representative, the U.S. Trustee, the Securities and Exchange Commission, and other parties in interest.[44]

60.     For these reasons, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### 4.     The Plan Provides for Court Approval of Payments for Services or Costs and Expenses (Section 1129(a)(4)).

61.     Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[45]

This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the bankruptcy court as reasonable.[46] Section 2.3 of the Plan contains procedures for filing applications for final allowance of Fee Claims and procedures for the payment of such Fee Claims upon

---

[43]   *See* Smith Decl. ¶ 9, 25.

[44]   *See id.*

[45]   11 U.S.C. § 1129(a)(4).

[46]   *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Printing Dimensions, Inc.*, 153 B.R. 715, 719 (Bankr. D. Md. 1993).

approval by the Bankruptcy Court.[47] Further, the Debtors' ordinary course professionals will be paid in the ordinary course as holders of Administrative Expense Claims consistent with the *Order Authorizing the Retention and Employment of Professionals Used in the Ordinary Course Nunc Pro Tunc to the Petition Date* [D.I. 108]. Therefore, the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### 5. The Plan and Plan Supplement Disclose the Liquidation Trustee and Delaware Trustee (Section 1129(a)(5)).

62.     Section 1129(a)(5)(A) of the Bankruptcy Code requires that the plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."[48] Section 1129(a)(5)(B) of the Bankruptcy Code further requires a plan proponent to disclose the "identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."[49]

63.     The Debtor has satisfied the foregoing requirements. Section 6.5 of the Plan provides for the winding down of the Debtors' corporate entities. On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any

---

[47]   *See* Smith Decl. ¶ 26.

[48]   11 U.S.C. § 1129(a)(5)(A)(i)–(ii).

[49] *Id.* § 1129(a)(5)(B).

corporate filings, and, unless subject to a separate agreement with the Liquidation Trustee, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date. Further, as part of the Plan Supplement, the Debtors have disclosed the identities of the Liquidation Trustee and Delaware Trustee. Such appointments will allow the Debtors to wind down under applicable law in an orderly fashion and make distributions to creditors and are consistent with the interests of creditors and interest holders and with public policy.[50] Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

> **6.     The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Plan because the Plan does not provide for rate changes subject to the jurisdiction of any governmental regulatory commission.

> **7.     The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

65.     Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity security holders of the debtor. This "best interests" test, focusing on potential individual dissenting creditors, requires that each holder of a claim or equity interest either accept the plan or receive or retain property under the plan that is not less than the amount such holder would receive or retain in a chapter 7 liquidation.[51]

---

[50] *See* Smith Decl. ¶ 15(g).

[51]     *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) (noting that "the 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan").

66.     Under the best interest analysis, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7."[52] Accordingly, the Court is required to "take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."[53] In evaluating the liquidation analysis, the Court must remain cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."[54] Under section 1129(a)(7), the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.[55]

67.     The Liquidation Analysis annexed as <u>Exhibit B</u> to the Disclosure Statement demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code and that under a chapter 7 liquidation holders of Claims and Interests would receive less than is projected under the Plan.[56]

68.     The uncontroverted assumptions and estimates in the Liquidation Analysis are appropriate in the context of these chapter 11 cases and are based upon the knowledge and expertise of the Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience. In light of the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

---

[52]    *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007).

[53]    *See id.*

[54]    *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (internal citations omitted).

[55]    *See Drexel Burnham Lambert Grp.*, 138 B.R. at 761.

[56]    *See* Smith Decl. ¶ 30.

69.     The "best interests" test is not implicated with respect to the following Classes: holders of Claims in Class 3 (General Unsecured Claims) which voted in favor of the Plan; and holders of Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) which were not impaired and thus were conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In contrast, the "best interests" test must be applied with respect to the following Classes: holders of Claims in Class 4 (Subordinated Claims), Class 5 (Interests), Class 6A (Intercompany Claims), and Class 6B (Intercompany Interests) pursuant to which holders will not receive any distribution under the Plan and thus are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

70.     The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (ii) the delay and erosion of value that would be caused to the Debtors' assets, (iii) the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee, and (iv) other potential claims that may arise in a chapter 7 liquidation. The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings. As such, the Debtors' Liquidation Analysis should be afforded deference.[57]

71.     Here, as set forth in the Liquidation Analysis and the Smith Declaration, all rejecting holders of Impaired Claims or Interests will receive or retain property value, as of the

---

[57] *See id.*

Effective Date, in an amount that is at least equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.[58]

### 8. *Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude Confirmation.*

72.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either (a) has accepted the plan or (b) is not impaired by the plan. A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[59] Moreover, a class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[60] Conversely, a class is deemed to have rejected a plan if such plan provides that the claims or interests in a class do not receive or retain any property under the plan on account of such claims or interests.[61]

73.    Here, Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are unimpaired under the Plan and therefore are deemed to have accepted the Plan. In addition, as set forth in the Voting Declaration, in accordance with the tabulation procedures in the Interim Disclosure Statement Order, Class 3 (General Unsecured Claims) unanimously voted to accept the

---

[58] *See id.* at ¶ 65–68.

[59] *See* 11 U.S.C. § 1126(c).

[60]    *See id.* § 1126(f).

[61]    *See id.* § 1126(g).

Plan within the meaning of section 1126 of the Bankruptcy Code. Accordingly, the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to all of the foregoing Classes.

74.     However, Class 4 (Subordinated Claims), Class 5 (Interests), Class 6A (Intercompany Claims) and Class 6B (Intercompany Interests) are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code because they will not receive any distributions or retain any property under the Plan. Nevertheless, the Debtors meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" such rejecting classes, as discussed more fully below.

### 9.     The Plan Provides for Payment in Full of All Allowed Administrative and Priority Claims (Section 1129(a)(9)).

75.     As required by section 1129(a)(9) of the Bankruptcy Code, except to the extent that a holder of a particular Claim has agreed to a different treatment of such Claim, Section 2.1 of the Plan provides for payment in full of Allowed Administrative Claims, Section 2.4 of the Plan provides for payment in full of Allowed Priority Tax Claims, and Section 4.1 of the Plan provides for payment in full of Other Priority Claims. Therefore, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

### 10.     At Least One Impaired Class of Claims That Was Entitled to Vote Has Accepted the Plan (Section 1129(a)(10)).

76.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims under a plan, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[62] As evidenced by the

---

[62]    *Id.* § 1129(a)(10).

34

Voting Declaration, Class 3 (General Unsecured Claims) is impaired and voted to accept the Plan, and does not include votes of any insider. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied as to each Debtor.

### 11.    The Plan Is Feasible (Section 1129(a)(11)).

77.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[63] Finding "feasibility" of a chapter 11 plan does not require a guarantee of success by the debtor.[64] Rather, a debtor must demonstrate only a reasonable assurance of success.[65] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[66] Bankruptcy courts in this District have approved plans that were subject to uncertain and contingent future events.[67]

78.    As set forth in the Smith Declaration, while the Plan provides for the liquidation of the Debtors, the Debtors estimate that they will have sufficient available cash to ensure that holders of Allowed Claims under the Plan receive the distributions required under the

---

[63]  *Id.* § 1129(a)(11).

[64]  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Kaplan*, 104 F.3d 589, 597 (3d Cir. 1997).

[65]  *Tribune I,* 464 B.R. at 185 (citing *In re Wash Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting *In re Orlando Invs. LP*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989))); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

[66]  *Tribune I,* 464 B.R. at 185 (quoting *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

[67]  *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 298–99 (finding plan feasible despite being conditioned on regulatory approval to operate a casino); *In re Wash. Mut. Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (finding plan feasible despite lack of regulatory approval for securities exemption); Jan. 15, 2015 Hr'g Tr. 88-89, *In re Seegrid Corp.*, No. 14-12391 (BLS) (Bankr. D. Del.) (finding, due to the confidence of the debtor's witnesses, that a startup company's Plan was feasible despite no evidence on balance sheet of ability to repay unsecured debt).

Plan and the Debtors otherwise satisfy their financial obligations under the Plan.[68] In addition, the Debtors estimate that the Liquidation Trust will have sufficient funding pursuant to the Wind-Down Budget to meet its obligations under the Plan to administer post-Effective Date responsibilities of the Debtors and wind down the Debtors' Estates.

79.     Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

### 12.     The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).

80.     Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provisions be made for their payment.[69] Section 13.3 of the Plan provides that the Debtors shall pay all fees arising under 28 U.S.C. § 1930 on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing these chapter 11 cases, these chapter 11 cases are converted or dismissed.[70] Thus, the Plan satisfies the requirements of section 1129(a)(12).

### 13.     Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Not Applicable to the Plan.

81.     The Debtors (i) do not have any retiree benefits as that term is defined in section 1114(a) of the Bankruptcy Code; (ii) are not required to pay any domestic support obligations; (iii) are not individuals; and (iv) are not nonprofit corporations or trusts. Accordingly, sections 1129(13)–(16) of the Bankruptcy Code are inapplicable to the Plan.[71]

---

[68]   *See* Smith Decl. ¶¶ 35.

[69]    11 U.S.C. § 1129(a)(12).

[70]   *See* Smith Decl. ¶ 36.

[71]   *See* Smith Decl. ¶ 37.

### 14. *The Plan Meets the Requirements for Cramdown (Section 1129(b)).*

82. Section 1129(b) of the Bankruptcy Code provides that when the requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[72] To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[73]

#### a. The Plan Does Not Discriminate Unfairly With Respect to Impaired Rejecting Classes.

83. The unfair discrimination standard of section 1129(b)(1) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.[74] Accordingly, as between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the classes are comprised of dissimilar claims or interests,[75] or (b)

---

[72]  *See* 11 U.S.C. § 1129(b).

[73]  *See id.* § 1129(b)(1); *Zenith*, 241 B.R. at 105; *Johns-Manville Corp.*, 843 F.2d at 650.

[74]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.") (citing *In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003) *aff'd*, 308 B.R. 672 (D. Del. 2004)); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990)); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, *In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[75]  *See, e.g., Johns-Manville Corp.*, 68 B.R. at 636.

taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[76]

84.    The Plan does not discriminate unfairly against the impaired Classes that are deemed to have rejected the Plan (i.e., Classes 4, 5, 6A and 6B). Section 1129(b) of the Bankruptcy Code does not prohibit differences in treatment between the classes. To the contrary, the very premise of any chapter 11 plan with multiple impaired classes is to differentiate among classes. Section 1129(b) of the Bankruptcy Code thus permits a debtor's chapter 11 plan to provide for unequal treatment of separately classified creditors with similar legal rights, so long as the discriminatory treatment of the impaired dissenting class is not "unfair."[77]

85.    With respect to the rejecting Classes, there is no unfair discrimination because there are no other Classes containing creditors with Claims or Interests similar to those in such Classes and each Class contains Claims and Interests that are similarly situated. Accordingly, the Plan does not discriminate unfairly against such Classes.

        b.    <u>The Plan Is Fair and Equitable With Respect<br>to the Rejecting Classes.</u>

86.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow

---

[76]  *See, e.g., Drexel Burnham Lambert Grp.,*138 B.R. at 715 (separate classification and treatment was rational where members of each class "possesse[d] different legal rights"), *aff'd sub nom. Lambert Brussels Asocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving classification of general unsecured creditors into different classes with different legal bases: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims); s*ee also In re Abeinsa Holding, Inc*., 562 B.R. 265, 274–75 (Bankr. D. Del. 2016) (rejecting challenge to separate classification in part on the basis that, even without the challenged classification, the voting results would not change); *In re Nuverra Env't Solutions, Inc.* 590 B.R. 75, 98–99 (D. Del. 2018) (district court dismissing claimants' appeal, determining the overwhelming acceptance within the claimant's class rendered argument moot).

[77]  *See Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 10 (D. Conn. 2006).

the "absolute priority rule" and satisfy the requirements of section 1129(b)(2) of the Bankruptcy Code.[78] Generally, this requires that the impaired rejecting class of claims or interests either be paid in full or that any class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[79] In addition, for a plan to be "fair and equitable," no class of claims or interests senior to the impaired dissenting class is permitted to receive more than the full value of its senior claims or interests under the plan.[80]

87.     Here, the Plan satisfies the absolute priority rule with respect to the rejecting Classes. First, no Class of Claims or Interests junior to such Classes will receive or retain any property under the Plan. Second, no Class of Claims or Interests will receive or retain property under the Plan that has a value greater than 100% nor has any party asserted as such. Accordingly, the Plan satisfies the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) and, therefore, is fair and equitable with respect to Classes 4, 5, 6A and 6B.[81]

---

[78]    *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii), (b)(2)(C)(ii); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 441–42.

The "fair and equitable" requirement may also be met: (a) with respect to a dissenting impaired class of unsecured claims if the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, and (b) with respect to a dissenting impaired class of interests, if the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, and fixed redemption price to which such holder is entitled, or the value of such interest. *See* 11 U.S.C. § 1129(b)(2)(B)(i), (C)(i). However, such subsections need not be invoked in this instance because the Plan meets other applicable requirements of the "fair and equitable" standard as set forth herein.

[79]    *See id.*

[80]    *See In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010).

[81]    *See* Smith Decl. ¶ 39.

***15.    Section 1129(c) of the Bankruptcy Code Is Satisfied.***

88.     Section 1129(c) of the Bankruptcy Code provides that the bankruptcy court may confirm only one plan.[82] Because the Plan is the only plan before the Court, section 1129(c) of the Bankruptcy Code is satisfied.

***16.    The Principal Purpose of the Plan Is Not Tax Avoidance (Section 1129(d)).***

89.     Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933. The Plan has been proposed in good faith and not for the avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933.[83] Moreover, no federal, state or local government unit, or any other party has raised any objection to the Plan on these or any other grounds, and all Priority Tax Claims will be paid in full pursuant to the Plan. The Debtors therefore submit that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Debtors respectfully request that the Court enter the Confirmation Order approving confirming the Plan and overruling all objections thereto, to the extent not previously resolved.

---

[82]    *See* 11 U.S.C. § 1129(c).

[83]    *See* Smith Decl. ¶ 39.

Dated: February 1, 2024
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Sophie Rogers Churchill*
Derek C. Abbott (No. 3376)
Curtis S. Miller (No. 4583)
Matthew O. Talmo (No. 6333)
Sophie Rogers Churchill (No. 6905)
Austin T. Park (No. 7274)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile:  (302) 658-3989
Email: dabbott@morrisnichols.com
      cmiller@morrisnichols.com
      mtalmo@morrisnichols.com
      srchurchill@morrisnichols.com
      apark@morrisnichols.com

*Counsel to the Debtors and Debtors in Possession*